**Daniel Richard ROBERTS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–77–30.**

Court of Criminal Appeals of Oklahoma.

Aug. 23, 1977.

John T. Elliott, Public Defender, John M. Stuart, Chief Appellate Div., Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Douglas L. Combs, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, Daniel Richard Roberts, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF–76–124, for the offense of Murder in the Second Degree, in violation of 21 O.S.Supp. 1973, § 701.2. His punishment was fixed at a term of imprisonment of not less than ten (10) years nor more than life, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial the evidence on behalf of the State established that in December, 1975, Myrtle Tipton lived at 3245 N.W. 15th Street in Oklahoma City, Oklahoma; that shortly prior to Christmas her son, Perry Paulding, and defendant, came to her home for a visit. They stayed until the Monday following Christmas at which time they planned to return to California. She went to work at 6:30 a. m. and when she returned at 4:00 p. m. her son and defendant were gone. She opened the door to Perry's bedroom and observed that the bedding was missing. The following Wednesday she went into the bedroom and discovered that the mattress, sheets, spread, quilts and pillows were also missing. She further observed small red spots on the wall and floor. She testified that she first learned of her son's death when she heard of an unidentified body, matching his description, which was found at Lake Overholser. The following night defendant called and reported that Perry had not arrived in California. The police were called after she heard the television report. They came to her home and investigated the scene. She testified that she kept a basketful of scrap macrame rope in Perry's bedroom.

Trooper Mike Grimes testified that on January 11, 1976, he received a call from his dispatcher to go to the south side of Lake Overholser. He observed a six-foot object wrapped in an olive-drab blanket, tied with manila rope at the neck, chest, waist and feet. He slightly opened the blanket and observed what appeared to be the head of a white male. He secured the scene until other officers arrived.

Edward Dean White testified that on December 29, 1975, he lived across the street from Myrtle Tipton. He observed defendant putting a rolled, tied-up mattress into the trunk of Perry Paulding's Monte Carlo.

Detective Ron Chambers testified that on January 11, 1976, he was dispatched to Lake Overholser. He made an investigation of the scene and helped unwrap the body from the blankets. The victim was only clothed in white boxer shorts and a white T-shirt. The name "D. W. Roberts" was stenciled on the shorts. The victim was lying on a purple sheet and pillow inside the blankets.

Dr. Fred B. Jordan testified that he performed an autopsy on the body of Perry Paulding. He found three stab wounds in the chest and blunt force injuries to either side of the head. It was his opinion that the cause of death was the stab wounds and the injuries to the head.

Detective John T. Boggs, of the Michigan State Police, testified that in January, 1976, he received a N.C.I.C. report to be on the lookout for a 1973 white Monte Carlo. He observed the vehicle on January 23, 1976, parked in the parking lot of a discount store. The car was kept under surveillance for approximately fourteen hours. The car was entered at approximately 2:00 a. m. the following morning, searched and impounded. Certain addresses were found within the car that subsequently led to the arrest of the defendant in a fraternity house in East Lansing.

Special Agent John Henry Campbell of the Federal Bureau of Investigation, testified that he interrogated the defendant on two occasions. The defendant was advised of his Miranda Rights and he acknowledged that he understood the same. During the first interrogation defendant stated that he was not aware that Paulding was deceased and declined to go into detail as to how he arrived in East Lansing. Defendant was later interrogated and, consented to make a statement. Defendant stated that he last saw Paulding at his mother's place and that Paulding had requested that he drive his car to California. He subsequently stated that he left Paulding at a shopping center where he met two individuals with a van. Paulding put the mattress he had removed from his mother's home into the van.

Richard E. Bisbing testified that he was a Laboratory Scientist with the Micro-Chemical Unit of the Michigan State Police; that on January 26, 1976, he processed the trunk of a 1973 Monte Carlo at the request of Detective Boggs. He found traces of Type "A" human blood in three locations within the trunk of the vehicle.

Officer John Loffi testified that he assisted in the investigation of the scene at Lake Overholser. He identified certain photographs taken at the scene and at the home of the victim's mother. He took possession of the physical evidence which was subsequently transported to the Oklahoma State Bureau of Investigation.

Melvin Hett, a Forensic Scientist at the Oklahoma State Bureau of Investigation, testified that he received State's Exhibit No. 1, containing an ironing board cover, a pink blanket and a lavender pillowcase from Officer Bruce Knox. He determined that the stains on each item were blood. He further testified that the stains on the floor tiles removed from the bedroom were also human blood. He compared the jute rope found wrapped around the body with samples of the rope removed from the bedroom and found that they had similar characteristics.

The testimony of Charles Duchain, taken at the preliminary hearing, was then read to the jury. Duchain testified that in December, 1975, he was the roommate of Perry Paulding in Encino, California; that on December 22, 1975, Paulding and defendant left California to visit Paulding's mother. Defendant called him from Albuquerque, New Mexico on December 29th and defendant arrived at the apartment in the early morning hours of December 31st. He helped defendant unload the car which contained both Paulding's and defendant's personal effects. Defendant informed him that Paulding was going to return to California with two people in a van. Paulding took a mattress from his mother's house and placed it in the van. He testified that defendant left California after he told him that someone was going to come by and pick up Paulding's car.

Ann Reed, a Forensic Chemist with the Oklahoma State Bureau of Investigation, testified that she received a blood sample of the victim from Dr. Jordan. She transported it to the laboratory, assigned it an identification number "76–417," and the sample was placed in a locked refrigerator.

Melvin Hett was recalled and testified that he examined the laboratory sample 76–417 and in his opinion the blood contained therein was group "A."

Larry Paulding, the victim's brother, testified that he went to Encino, California after the funeral to obtain Perry's effects. He identified State's Exhibit No. 54 as his brother's wallet.

Myrtle Tipton was recalled and identified the ironing board pad and the lavender pillowcase contained in State's Exhibit No. 1, as her personal property.

For the defense, defendant testified that he met Perry Paulding in the Los Angeles County Jail. He was being held on a parole violation and Paulding was being held on a drug charge. Paulding offered to find him a job and a place to stay when he was released. He was released from jail approximately a week later and started living with Paulding and his roommate, Charles Duchain. Paulding informed him that he was "gay" and he told Paulding that he would not engage in such activities. He accompanied Paulding to his mother's residence in Oklahoma City. They planned to return to California on the Sunday after Christmas. Paulding received a telephone call and decided to wait until the following day. Paulding told him that he was going to ride back to California "with some other dudes." He put the mattress in the car at Paulding's request. They drove to a shopping center where Paulding met the two males. Paulding placed the mattress in a dark-colored van. Paulding told him to drive the car back to California and wait for him. He had car trouble in Albuquerque and called Charlie Duchain. He advised Duchain that Paulding was going to ride back with two other persons. He drove to Encino and stayed there about a week and a half. When Paulding did not return as expected, he attempted to file a missing persons report with the police. He was advised that a report could not be filed if a person was over the age of eighteen years. He left California to go to Michigan because he did not want the bank to pick up Paulding's car. He left the car parked at the shopping center because of car trouble.

■ Defendant first asserts that the trial court erred in allowing the introduction into evidence the testimony of Myrtle Tipton relating the substance of a telephone conversation between her and Charles Duchain, which was hearsay. The testimony of which defendant now complains appears in the trial transcript, page 19, as follows:

"Q. (By Mr. Geb) Yes, just tell, Miss Tipton, only what you did to find your son?

"A. I didn't get that.

"Q. What did you do to try to find your son?

"A. Mr. Duchain called me. He was alarmed because Perry hadn't gotten out there and so we just kept the conversations going back and forth to see if anyone had any—

"MR. TUDOR: Your Honor, I object to that. It is purely hearsay.

"THE COURT: Well, I haven't heard any conversations related so far. Overruled."

We are of the opinion that the witness' response does not fall within the hearsay rule. This principle was set forth by this Court in *Williams v. State*, Okl.Cr., 542 P.2d 554 (1975), wherein we cited with approval 29 Am.Jur.2d, Evidence, § 497, Page 555, which states:

"'. . . The clearest case of hearsay is where a witness testifies to the declarations of another for the purpose of proving the facts asserted by the declarant. The hearsay rule, however, does not operate, even apart from its exceptions, to render inadmissible every statement repeated by a witness as made by another person. *It does not exclude evidence offered to prove the fact that a statement was made or a conversation was had, rather than the truth of what was said. Where the mere fact that a statement was made or a conversation was had is independently relevant, regardless of its truth or falsity, such evidence is admissible as a verbal act . . .'* (Footnotes omitted)" [Emphasis added]

■ Defendant next contends, under the first assignment of error, that the trial court erred in allowing testimony of Charles Duchain referring to his phone bills, specifically relating to the telephone call from defendant to him from Albuquerque, New Mexico and the telephone call from the victim's brother. We need only observe that the record totally fails to show that defendant objected to the testimony or to

the exhibit itself. We have consistently held that where evidence is admitted, without objection, defendant may not complain upon appeal about its introduction. See *Hampton v. State*, Okl.Cr., 407 P.2d 210 (1965) and *Young v. State*, Okl.Cr., 531 P.2d 1403 (1975).

Defendant complains, in the second assignment of error, that the prosecuting attorney committed fundamental and reversible error when evidence was adduced from Agent Campbell that defendant declined to answer certain questions about how he came to Michigan and whether he had driven the deceased's automobile. Defendant argues that such testimony violates the rule enunciated by the United States Supreme Court in *Griffin v. California*, 380 U.S. 609, 14 L.Ed.2d 106, 85 S.Ct. 1229, wherein the United States Supreme Court held that such evidence of an accused's pre-trial silence is not admissible. This Court, in *Buchanan v. State*, Okl.Cr., 523 P.2d 1134 (1974), recognized that to elicit testimony of a defendant's pre-trial silence is likewise error. Expanding the rule in *Burroughs v. State*, Okl.Cr., 528 P.2d 714 (1974), we stated:

"There is a presumption that error of this kind is prejudicial, and in reviewing a case it becomes necessary for this Court to give full consideration to the record and determine whether said presumption has been overcome and that prejudice did not result."

We have carefully examined the record and are of the opinion that the presumption of prejudice created by the testimony of defendant's pre-trial silence was overcome. Agent Campbell testified that defendant later waived his constitutional rights and fully answered the questions which he had previously declined to answer. Defendant testified that he did make certain statements to Agent Campbell. It is, thus, readily apparent that the evidence of defendant's original silence was not used to imply his guilt.

We would further observe that the record reflects that defendant did not object to the testimony concerning his original silence.

In *Engram v. State*, Okl.Cr., 545 P.2d 1285 (1976), we stated:

"After careful examination of the record, we find that the error, if any, in permitting Officer Endicott to testify as to the defendant's silence at the time of his arrest was cured by failure to object and request admonition by the court, and by defendant's own testimony in his own defense that he chose to remain silent before having an attorney present.

"We are therefore strongly persuaded that defendant's own testimony at trial cured the error he now asserts on review and for this reason we find defendant's third assignment of error to be without merit." [Footnote omitted]

Defendant asserts, in the third assignment of error, that the trial court committed fundamental and reversible error in allowing the prosecuting attorney to introduce into evidence the testimony of Charles Duchain as read from the preliminary hearing transcript, without a proper predicate having been made for the introduction thereof. We agree with defendant's assertion that the State did not establish the proper predicate for the introduction of the testimony. The record reflects that the prosecuting attorney informed the court as follows:

"I would request, at this time, that the state wishes to state to the Honorable Court that the state has used all diligence necessary, to-wit: called Mr. Charles Duchain, served him with a subpoena, was assurred [sic] by Mr. Duchain that he would be here and yesterday which was the 8th or 9th, I believe—the 9th of June, 1976, after having not appeared, I called Mr. Duchain. He said he wouldn't come for the trial.

"The state further says that Mr. Tudor was the attorney of record in the preliminary hearing that was transcribed here.

"The state feels that they have used all the diligence to try to get him here." [Tr. 182 & 183]

In dealing with a similar question in *Holmes v. State*, Okl.Cr., 501 P.2d 830 (1972), we stated:

". . . At the trial, although the Assistant District Attorney stated that he was prepared to offer testimony as to the unavailability of the witness, no testimony was offered. We are of the opinion that the showing of due diligence to prove the unavailability of a witness requires more from the State than the mere issuance of a subpoena and the return of 'Not found.' Testimony should have been offered as to what efforts, if any, were made to serve the subpoena and the ultimate fact that the witness was unavailable to testify. . . ."

■ We would observe, however, that defendant did not object, asserting that the District Attorney failed to show due diligence in securing the presence of the witness. The defense counsel stipulated that he was present at the preliminary hearing and had the opportunity to cross-examine the witness. He further stipulated that the transcript was accurate and complete. The only objection to the testimony raised by the defendant was to re-assert certain objections taken to the testimony before the Magistrate which had been overruled. The trial court thereupon stated:

"All right, the Court is going to rule that the transcript may be offered and read under these guidelines.

"Mr. Geb may read any portion that he cares to. He may omit any portion he cares to. Any questions not objected to at the preliminary hearing, those objections will be considered waived.

"Any objections made at the preliminary will be reviewed by this Court and ruled upon by this Court and may or may not follow the rules made at the preliminary hearing." (Tr. 185–186).

We thus conclude that the defendant's failure to object to the reading, or manner of reading, of the transcript waived the error. See, *Hampton v. State*, supra. We would further observe that the testimony of the witness was not damaging to the defendant. Duchain testified that the defendant arrived in California driving the defendant's car and had in his possession certain personal property belonging to the victim. Duchain testified that defendant informed him that Paulding was going to return to California with two persons in a van. This testimony did not differ substantially from the testimony of defendant. We have previously held that the use of a preliminary hearing transcript, although improper, is not grounds for reversal if the evidence was merely cumulative. See, *Moore v. State*, Okl.Cr., 507 P.2d 1290 (1973).

■ Defendant finally contends that the trial court erred in allowing the District Attorney to repeatedly propound improper questions on cross-examination of defendant and such prosecutorial misconduct, deprived defendant his right to a fair trial. We have carefully examined the entire cross-examination of the defendant and find that although some of the questions propounded were improper, the trial court correctly sustained objections thereto. In *Sands v. State*, Okl.Cr., 542 P.2d 209 (1975) we stated:

"The determination of whether or not conduct and remarks of counsel will serve as a basis for reversal is contingent upon the effect which said remarks have on the rights of defendant. We must keep in mind that the defendant's rights are of utmost importance and if remarks of the prosecutor, though inappropriate or rude, do not affect the rights of the defendant, then they shall serve no basis for reversal. In *Kite v. State*, Okl.Cr., 506 P.2d 946 (1973) and *Pickens v. State*, Okl.Cr., 450 P.2d 837 (1969), this Court held that for remarks of the prosecuting attorney to constitute reversible error they must be flagrant and of such a nature as to be prejudicial to the defendant. . . ."

We are of the opinion that the prosecuting attorney's conduct in the cross-examination of the defendant was not so flagrant and of such a nature as to warrant reversal.

In conclusion we observe that from our examination of the record as a whole it is our opinion that the defendant received a fair and impartial trial before a jury, that no fundamental right of the defendant was prejudiced and that judgment and sentence

appealed from should be and the same is hereby AFFIRMED.

BRETT, J., concurs.